FILED

MAY 4  3 51 PM '99

EASTERN DI... CALIF
AT FRESNO
BY_____
DEPUTY

1

2

3

4

5

6

7

8 **IN THE UNITED STATES DISTRICT COURT**

9 **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11 DWAYNE McELWEE, et al,                      CASE NO. CV-F-94-5712-SMS-P

12                      Plaintiffs,            MEMORANDUM OPINION AND
                                             ORDER RE DEFENDANTS' MOTION
13        vs.                                FOR SUMMARY JUDGMENT (192)

14 JAMES GOMEZ, et al.,

15                      Defendants.
                                        /
16

17        Plaintiffs are current and former state prisoners (collectively "Plaintiffs") proceeding with

18 appointed counsel in a civil rights action pursuant to 42 U.S.C. § 1983.  Pursuant to 28 U.S.C. § 636(c)

19 and Fed. R. Civ. P. 73, the parties have consented to proceed before the United States Magistrate Judge.

20 Pending before the court is the motion for summary judgment brought by Defendants Gomez, Stainer,

21 Hill, Hunt, Hiebert, and Wosar (collectively "Defendants").

22        This action proceeds on the verified first amended complaint filed on December 22, 1994, and

23 amended complaint-in-intervention, filed on April 23, 1997.  Defendants filed their answer to the

24 amended complaint-in-intervention on August 18, 1997.[1]  On July 16, 1998, the court issued an order

25 bifurcating the trial, with Phase I addressing issues of liability and Phase II addressing issues of damages.

26 That order also permitted Defendants to file a second motion for summary judgment addressing Phase

27

28 _____
[1]        Defendants' answer was filed pursuant to the court's July 18, 1997, order denying Defendants' first motion
for summary judgment.

1

1   I trial issues only. Pursuant to the court's July 16, 1998, order, Defendants filed the instant motion for

2   summary judgment on February 16, 1999. Plaintiffs filed an opposition on March 12, 1999. Defendants

3   filed a reply on March 29, 1999.

4         Defendants' motion came on regularly for hearing on April 5, 1999, at 10:00 a.m. in Department

5   4 of the above-entitled court, the Honorable Sandra M. Snyder presiding.  Appearing on behalf of

6   Defendants was the Attorney General of the State of California by Deputy Attorney General Bernice

7   Louie Yew, Esq., and Deputy Attorney General David Verhey, Esq.  Appearing on behalf of Plaintiffs

8   was Franck & Associates by Herman Franck, Esq.  Upon consideration of the moving, opposition, and

9   reply papers, and evidence submitted therewith, as well as the oral arguments of counsel and the

10  complete court file in this matter, the court issues the following memorandum opinion and order.

11

12  **SUMMARY OF FACTS**

13        The California Correctional Institution at Tehachepi ("CCI"), operated and maintained by the

14  California Department of Corrections ("CDC"), consists of two minimum-security facilities (Units I and

15  III), one medium-security facility (Unit II), and two maximum-security facilities (Units IV-A and IV-B).

16  CCI is served by one wastewater treatment plant and two separate drinking water systems.  The

17  wastewater treatment facility currently consists of a headworks, nine aerated treatment ponds, and

18  approximately 87 acres of pasture used for spray irrigation. This spray irrigation field is operated year-

19  round by CCI staff and monitored to alleviate ponding and run-off.  Drinking water is furnished by

20  means of two separate systems. Units I, II, and III, as well as all other domestic uses (except Units IV-A

21  and IV-B), are all currently served by groundwater drawn from a single well (Well 12).  This well is

22  located approximately 500 feet from the spray irrigation field. Units IV-A and IV-B are currently served

23  by surface water diverted from the California State Water Project Aqueduct.  The groundwater system

24  serving Units I, II, and III has been designated by the California Department of Health Services ("DHS")

25  as a "community water system."  As such, DHS has required and monitored regular testing of the water

26  groundwater system at CCI since 1988.

27  / / /

28  / / /

1    During the time period which is the subject of this litigation (1989 to 1998), the groundwater

2  system obtained water from three wells – Well 10, Well 11, and Well12 – all located in the same well

3  field approximately 100-500 feet from the spray irrigation field utilized in the wastewater treatment

4  process.  The well field is located within 450 feet of the wastewater treatment ponds.

5    Well 10 was constructed in 1950 and is 350 feet deep.  Well 10 is located about 100 feet from

6  the spray irrigation field.  Well 10 possesses a surface annular sanitary seal which, according to

7  Defendants' civil engineering expert, Joseph Scalmanini, "...precludes any ease of introduction of

8  surface water and/or treated waste water into the well structure..."  Well 10 was removed from service

9  in 1997 but continues to be used for monitoring purposes only.

10    Well 11 was probably constructed in 1963[2] and is 464 feet deep.  Well 11 is located about 300

11  feet from the spray irrigation field.  Although Well 11 does not possess a surface annular sanitary seal,

12  Mr. Scalmanini opines that the presence of a surface concrete slab "...effectively seals against substantial

13  infiltration of surface water into the well."  Well 11 was permanently abandoned and filled with concrete

14  in 1997 due to a casing failure.

15    Well 12 was constructed in 1964 and is 472 feet deep.  Well 12 is located approximately 500 feet

16  from the spray irrigation field.  As with Well 10, Well 12 possesses a surface annular sanitary seal.

17  Further, the wellhead sits on a pedestal raised 26 inches above the surface and is housed in a metal utility

18  building which, according to Mr. Scalmanini, "...further precludes any introduction of surface water

19  and/or spray-applied waste water into the well structure."  Well 12 is currently the only source of

20  groundwater utilized at CCI.

21    The groundwater system as it is currently configured is typical of such systems.  Water is pumped

22  from a well source (Well 12) and is transported under pressure to a booster pump house where it is

23  collected in a "wet well" – a sealed solid concrete tank which serves as a reservoir.  Water collected in

24  the wet well is then treated with gaseous chlorine by means of high-pressure injection. After

25  chlorination, the water is distributed to Units I, II, and III as well as the visitor's center and staff

26  residences.  At all relevant times, groundwater treatment procedures exceeded the standards applicable

27

28    [2]    Documents filed incident to Defendants' motion indicate that there are no records of the construction of
Well 11.  This date is based on a DHS well data summary prepared in 1989.

to surface water systems (which are more stringent due to the increased likelihood of contamination). It should be noted that, according to documents submitted incident to this motion, volatile organic compounds ("VOCs") are not affected by chlorinization.

Samples taken from the wells between 1989 and 1993 indicated the presence of nitrates, as well as two types of VOCs – trichloroethylene (TCE), and tetrachloroethylene (PCE).[3]  While all detected levels of these contaminants were at concentrations below the maximum contaminant level ("MCL") allowed by applicable regulations, the mere presence of these contaminants caused DHS to conclude that water pumped from the well field had been adversely impacted by proximity to the wastewater treatment operation.  As a result of this finding, the operation permit issued to CCI by DHS on November 24, 1993,[4] allowed continued operation of water systems subject to the condition that CCI "...shall discontinue the use of the groundwater supply wells as soon as possible and replace the lost supply with properly treated surface water or groundwater from wells approved by [DHS]."

In a compliance order issued on March 8, 1994, DHS noted that CCI had not submitted any plan for discontinuing the use of groundwater supplied by the well field and found CCI to be in violation of Title 17 of the California Code of Regulations, § 7583(i) (which defines reclaimed water as a wastewater which, as a result of treatment, is suitable for uses other than potable use), Title 22 of the California Code of Regulations, § 64403(a)(1) (which specifies that it is the responsibility of the water supplier to exercise due care and diligence to protect the water sources under its control), and California Health and Safety Code § 4017(c) (which requires any person who operates a public water system to provide a reliable and adequate supply of pure, wholesome, healthful, and potable water).  Pursuant to the compliance order: (1) CCI is required to discontinue use of Well 10, Well 11, and Well 12 until assurance is provided to DHS that those wells are not supplying water that has been degraded by the wastewater treatment process; (2) if CCI can not provide such assurance, discontinue the use of the groundwater supply as soon as possible and replace the lost supply with properly treated surface water

---

[3]      The court notes that CCI operated a dry cleaning facility which utilized TCE and PCE as solvents.  That plant was shut down sometime in 1993.

[4]      While DHS was involved with the monitoring of CCI's water systems prior to this date, the evidence submitted indicates that no permit was required or issued prior to November 1993.

1  or groundwater from wells approved by DHS; and (3) prior to May 2, 1994, submit a written report

2  which includes a plan and time schedule for compliance with (1) and/or (2).  The compliance order lead

3  CDC to prepare and submit various cost-benefit analyses and budget requests incident to complying with

4  the DHS mandate.  It appears from the documents submitted that this process is ongoing.

5     On May 10, 1994, a Bakersfield newspaper ran an article which stated that the water supply at

6  CCI was contaminated.  That article prompted scores of inmates from CCI to file actions in this court,

7  alleging violations of their Eighth Amendment rights.[5]  The court notes that, since the inception of this

8  case in 1994, CCI has conducted regular testing of the quality of the groundwater, both at the wells and

9  at the points of use, pursuant to sampling schedules promulgated by DHS.[6]

10

11            **LEGAL STANDARDS FOR SUMMARY JUDGMENT**

12     Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as

13  to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

14  P. 56(c); see Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Poller v. Columbia Broadcast

15  System, 368 U.S. 464, 467 (1962); Jung v. FMC Corp., 755 F.2d 708, 710 (9th Cir. 1985); Loeh v.

16  Ventura County Community College Dist., 743 F.2d 1310, 1313 (9th Cir. 1984).  A genuine issue of

17  material fact exists when "...there is sufficient evidence favoring the non-moving party for a jury to

18  return a verdict for that party."   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  Facts are

19  material when so rendered by the applicable substantive law.  Id. at 248.  Thus, summary judgment

20  should be entered, after adequate time for discovery and upon motion, against a party who fails to make

21  a showing sufficient to establish the existence of an element essential to that party's case, and on which

22  that party will bear the burden of proof at trial.  Celotex Corp. v. Catarett, 477 U.S. 317, 322.  "[A]

23  complete failure of proof concerning an essential element of the non-moving party's case necessarily

24  renders all other facts immaterial," and, in such circumstances, summary judgment should be granted

25

26    [5]  One of those actions was the instant case filed by Plaintiff Dwayne McElwee and several other inmates

27  at CCI.  All the other actions have been voluntarily dismissed as a condition of intervention in this action.

28    [6]  In fact, the documents submitted by Defendants indicate that, even before the March 1994 DHS
compliance order, groundwater samples were regularly tested.  Defendants have submitted data for the years 1989 to 1998.

1    "...so long as whatever is before the...court demonstrates that the standard for entry of summary

2    judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

3          Under summary judgment practice, the moving party:

4                [A]lways bears the initial responsibility of informing the...court of the
                 basis for its motion, and identifying those portions of "the pleadings,
5                depositions, answers to interrogatories, and admissions on file,
                 together with the affidavits, if any," which it believes demonstrate the
6                absence of a genuine issue of material fact.

7                Id.

8    "[W]here the non-moving party will bear the burden of proof at trial on a dispositive issue, a summary

9    judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to

10   interrogatories, and admissions on file.'" Id.   If the moving party in such cases meets its initial

11   responsibility, the burden then shifts to the opposing party to establish that a genuine issue actually exists

12   as to any material fact. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986);

13   First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-289 (1968); Ruffin v. County of Los

14   Angeles, 607 F.2d 1276, 1280 (9th Cir. 1979), cert. denied, 455 U.S. 951 (1980).

15         In resolving the summary judgment motion, the court examines the pleadings, depositions,

16   answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P.

17   56(c); Poller, 368 U.S. at 468; SEC v. Seaboard Corp., 677 F.2d 1301, 1305-1306 (9th Cir. 1982). The

18   evidence of the opposing party is to be believed and all reasonable inferences that may be drawn from

19   the facts placed before the court must be drawn in favor of the opposing party. Anderson, 477 U.S. at

20   255; Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655  (1962) (per

21   curiam)); Abramson v. University of Hawaii, 594 F.2d 202, 208 (9th Cir. 1978).  Nevertheless,

22   inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual

23   predicate from which the inference may be drawn.  Richards v. Nielson Freight Lines, 602 F. Supp.

24   1224, 1244-1245 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

25         In attempting to establish the existence of this factual dispute, the opposing party may not rely

26   upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of

27   affidavits, or admissible discovery material, in support of its contention that the dispute exists. Fed. R.

28   Civ. P. 56(e); Matsushita, 475 U.S. at 586, fn. 11; First Nat'l Bank, 391 U.S. at 289; Strong v. France,

6

1   474 F.2d 747, 749 (9th Cir. 1973).  The opposing party must demonstrate that the fact in contention is

2   material (i.e., a fact that might affect the outcome of the suit under the governing law).  Anderson, 477

3   U.S. at 248; T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

4   The opposing party must also show that the dispute is genuine (i.e., that the evidence is such that a

5   reasonable jury could return a verdict for the non-moving party).  Anderson, 477 U.S. at 248-249; Wool

6   v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

7          In the endeavor to establish the existence of a factual dispute, the opposing party need not

8   establish a material issue of fact conclusively in its favor.  It is sufficient that "...the claimed factual

9   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."

10  First Nat'l Bank, 391 U.S. at 290; T.W. Elec. Serv., 809 F.2d at 631.  However, to demonstrate a

11  genuine issue, the opposing party "...must do more than simply show that there is some metaphysical

12  doubt as to the material facts... Where the record taken as a whole could not lead a rational trier of fact

13  to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587

14  (citations omitted).  Thus, the "...purpose of summary judgment is to 'pierce the pleadings and to assess

15  the proof in order to see whether there is a genuine need for trial.'" Matsushita 475 U.S. at 587 (quoting

16  Fed. R. Civ. P. 56(e) advisory committee note on 1963 amendments); International Union of Bricklayers

17  v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

18

19                                  **DISCUSSION**

20         Defendants argue that summary judgment should be granted in their favor, as a matter of law,

21  for the following reasons: (1) Plaintiffs' claim for injunctive relief is barred under the Prison Litigation

22  Reform Act ("PLRA");[7] (2)  Plaintiffs cannot establish that the quality of drinking water violated Eighth

23  Amendment standards; and (3) Defendants are entitled to qualified immunity.  At the outset, the court

24  notes that the pleadings filed incident to this motion raise two preliminary issues.  The court will address

25  these issues first.

26  _____

27        [7]      Pursuant to the court's July 16, 1998, order, Defendants were permitted to raise only those arguments
    relevant to Phase I liability issues.  Given that this issue falls outside the scope of permissible argument, Defendants'

28  argument concerning Plaintiffs' claims for injunctive relief are not properly before the court on the instant motion and will
    not be addressed herein.

1    In their opposition to Defendants' motion, Plaintiffs argue that Defendants' concession as to an

2    essential element of Plaintiffs' Eighth Amendment claims during oral argument on a previous motion

3    for summary judgment, and the court's order thereon, constituted "law of the case" and precludes

4    Defendants from re-litigating that issue in the instant motion.   However, the law of the case doctrine

5    does not apply to pre-trial rulings, such as motions for summary judgment.   Preaseau v. Prudential Ins.

6    Co. of America, 591 F.2d 74, 79-80 (9th Cir.1979); Shouse v. Ljunggren, 792 F.2d 902, 904 (9th Cir.

7    1986).   A district court judge may grant a motion for summary judgment that was previously denied by

8    another district court judge.   Shouse 792 F.2d at 904.   This rule is not different where the parties have

9    consented, as they have in this case, to having a Magistrate Judge hear the dispute.   Id.

10    Even if the doctrine applied to pre-trial rulings, the doctrine would not apply in this case because

11    a court creates law of the case only when it clearly intends to decide the issue.   See Federal Insurance

12    Co. v. Scarsella Bros., Inc..   In this case, Defendants' concession was made for purposes of argument

13    only and, in any event, the court did not decide the issue since, given the concession, it focused on other

14    elements of Plaintiffs' claims.   For these reasons, Plaintiffs' argument that the court's ruling on

15    Defendants' prior motion for summary judgment created law of the case is without merit.

16    The second preliminary issue concerns the admissibility of the declaration of Dr. James E.

17    Lessenger – Plaintiffs' expert witness – filed in support of Plaintiffs' opposition.   Specifically,

18    Defendants contend in their reply brief that Dr. Lessenger's declaration should be disregarded pursuant

19    to Fed. R. Evid. 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 809 U.S. 579 (1993), because:

20    (1) Dr. Lessenger's testimony does not reflect any scientific bases for his conclusions; and (2) Dr.

21    Lessenger's testimony is irrelevant to the issues presented by Defendants' motion.   Federal Rule of

22    Evidence 702 provides that, if scientific, technical, or other specialized knowledge will assist the trier

23    of fact, then expert testimony may be received.   Daubert requires that any such expert testimony must

24    reflect scientific knowledge and be relevant to the issues.   Id. at 597.   In this case, the court is sitting in

25    review of a motion for summary judgment and, therefore, is not acting as a trier of fact.   Thus, Fed. R.

26    Evid. 702 and Daubert do not apply.   The parties are advised that the court has given due consideration

27    to Defendants' objections in its evaluation of Dr. Lessenger's testimony.

28    / / /

8

1     The court next turns to a discussion of the substantive arguments properly before the court on

2     the instant motion for summary judgment.

3     **A.    Plaintiffs' Eighth Amendment Claims**

4     Plaintiffs allege that they were exposed to an excessive risk to their safety when Defendants

5     provided them allegedly unsafe drinking water and that this conduct violated their constitutional rights

6     under the Eighth Amendment.

7          1.    Applicable Eighth Amendment Legal Standards

8     The Supreme Court has held that "[t]he Eighth Amendment embodies broad and idealistic

9     concepts of dignity, civilized standards, humanity, and decency." Estelle v. Gamble, 429 U.S. 97, 102

10    (1976) (citation and internal quotations omitted); see also Hutto v. Finney, 437 U.S. 678, 685 (1978).

11    Therefore, the conditions under which a prisoner is confined are subject to scrutiny under the Eighth

12    Amendment.  Helling v. McKinney, 509 U.S. 25, 31 (1993); see also Farmer v. Brennan, 511 U.S. 825,

13    832 (1994).  Conditions of confinement may, consistent with the Constitution, be restrictive and harsh.

14    Rhodes v. Chapman, 452 U.S. 337, 346 (1981).  The Eighth Amendment does not mandate comfortable

15    prisons nor does it mandate broad prison reform or excessive federal judicial involvement.  Farmer, 511

16    U.S. at 832; Hoptowit v. Ray, 682 F.2d 1237, 1246 (9th Cir. 1982).  The Eighth Amendment does not

17    conflict with incarceration.  Rather, it limits the hardships which may be inflicted upon an incarcerated

18    person as "punishment."  Jordan v. Gardner, 986 F.2d 1521, 1530 (9th Cir. 1993).  Prison officials must

19    provide prisoners with "food, clothing, shelter, sanitation, medical care, and personal safety." Toussaint

20    v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1981); see also Hoptowit, 682 F.2d at 1246; Wright v.

21    Rushen, 642 F.2d 1129, 1133 (9th Cir. 1981).

22    No static test can be used to determine whether the conditions of confinement are cruel

23    and unusual, "...for the Eighth Amendment 'must draw its meaning from the evolving standards of

24    decency that mark the progress of a maturing society.'" Rhodes, 452 U.S. at 347 (quoting Trop v. Dulles,

25    356 U.S. 86, 101 (1958)).  Generally, in order to prevail on an Eighth Amendment claim, the plaintiff

26    must establish an objective element and a subjective element.  First, as to the objective requirement, the

27    defendant's "...act or omission must result in the denial of 'the minimal civilized measure of life's

28    necessities.'" Farmer, 511 U.S. at 834 (citation omitted).  The second (subjective) requirement follows

1  from the principle that only the unnecessary and wanton infliction of pain implicates the Eighth

2  Amendment. Id. Therefore, to establish the subjective component, the plaintiff must show that the

3  defendant possessed a sufficiently culpable state of mind. Id. See also Wilson v. Seiter, 501 U.S. 294,

4  299-300 (1991) (discussing the subjective requirement); Oslinski v. Kane, 92 F.3d 934, 937 (9th Cir.

5  1996); Wallis v. Baldwin, 70 F.3d 1074, 1076-1077 (9th Cir. 1995); Allen v. Sakai, 48 F.3d 1082, 1087

6  (9th Cir.), cert. denied, 115 S.Ct. 1695 (1995); Anderson v. County of Kern, 45 F.3d 1310, 1312-1313

7  (9th Cir. 1995); LeMaire v. Maass, 12 F.3d 1444, 1451 (9th Cir. 1991).

8  　　　　In order to prevail on a claim under § 1983 for violation of the Eighth Amendment based

9  on an alleged abrogation of prison officials' duty to take reasonable steps to provide for inmate safety,

10 the plaintiff must establish that the defendant "[knew] of and disregard[ed] an excessive risk to

11 inmate...safety." Farmer, 511 U.S. at 837. In order to establish the existence of such an excessive risk

12 (the objective component) for purposes of the objective component of the analysis, the plaintiff must

13 demonstrate that the risk of which he complains is so grave that it violates contemporary standards of

14 decency to expose anyone unwillingly to such a risk. Helling, 509 U.S. at 35. In other words, "...the

15 prisoner must show that the risk...is not one that today's society chooses to tolerate." Id. With respect

16 to drinking water, the Supreme Court has indicated in dicta that an excessive risk may be present if the

17 water was "demonstrably unsafe." Id.

18 　　　　As to the subjective component, the prison official must "...be aware of the facts from

19 which the inference could be drawn that a substantial risk of serious harm exists, and must also draw the

20 inference." Farmer, 511 U.S. at 837. To prove knowledge of the risk, however, the plaintiff may rely

21 on circumstantial evidence. In fact, the very obviousness of the risk may be sufficient to establish

22 knowledge. Id. at 842. Prison officials may not escape liability because they cannot, or did not, identify

23 the specific source of the risk. The "serious threat" can be one to which all prisoners are exposed. Id.

24 at 843. Prison officials may avoid liability, however, by presenting evidence that they lacked knowledge

25 of the risk. Id. at 844. Moreover, prison officials may also avoid liability by presenting evidence of a

26 reasonable, albeit unsuccessful, response to the risk. Id. at 844-845. See also Berg v. Kincheloe, 794

27 F.2d 457, 462 (9th Cir. 1986).

28 ///

10

1    Given the foregoing authorities, the court must focus on whether the drinking water at

2 CCI represented a risk to inmate safety that today's society chooses not to tolerate such that exposure

3 to the risk violated contemporary standards of decency.[8]  Defendants argue that, as measured by

4 applicable regulations, the water was safe both at its source and at its points of use and, therefore, did

5 not pose an excessive risk to inmate safety.  Defendants contend that the inquiry should focus on the

6 condition of the water at the point of use since that is where Plaintiffs would have been exposed to the

7 risk allegedly represented by the water.  Plaintiffs appear to argue that the court should consider the

8 condition of the water at its source in determining whether it posed an excessive risk to inmate safety.[9]

9    With respect to whether the analysis should focus on the condition of the water at the

10 source or point of use, the court agrees with Defendants' argument that, until the water comes out of the

11 tap and is actually used, Plaintiffs are not actually exposed to any potential risk represented by the water.

12 While Plaintiffs argue that the danger posed by the proximity of the wells to the spray irrigation field

13 represents the excessive risk in this case, the court is not persuaded by this argument.  Plaintiffs do not

14 argue (and there is no evidence presently before the court to suggest) that any plaintiff in this case drank

15 or was otherwise exposed to CCI's groundwater at any point other than the final points of use in Units

16 I, II, and III.  Therefore, whether the water represented an unacceptable risk at the source or whether the

17 wells are too close to the spray irrigation field are immaterial issues.[10]  The court finds that the relevant

18 inquiry in this case should focus on the risk, if any, at the point of use.

19 / / /

20 / / /

21 / / /

22 

---

23    [8]    The court notes that Defendants' instant motion does not address the subjective component of Plaintiffs'
24 claims.  That issue was raised in Defendants' first motion for summary judgment, which was denied by order issued on July
18, 1997.

25    [9]    The gravamen of Plaintiffs' entire case is that, since the wells were too close to the spray irrigation field
utilized in the wastewater treatment process (a fact which does not appear to be in dispute), the water from those wells
26 necessarily posed an excessive risk to Plaintiffs' safety.

27    [10]    While these questions are indeed serious (as evidenced by the continued involvement of DHS and the
various proposals for complying with the compliance order that have been offered by CDC), they are simply not relevant
28 to Plaintiffs' claims in this case.

1    2.    Defendants' Evidence

2            In an effort to establish their initial burden, Defendants have presented extensive water

3    testing data which documents the quality of groundwater at various points of use.[11] Defendants' Exhibits

4    L, M, N, O, P, Q, R, S, T, and U show that samples taken from various points of use and tested regularly

5    from 1989 to 1998 all indicated that potential contaminants were below the applicable MCL.  Further,

6    notes on many of the test results indicate that the water tested was safe for drinking within the meaning

7    of Title 22 of the California Code of Regulations.  Upon close scrutiny of all the data provided by

8    Defendants, the court finds no evidence that the water supplied to the units ever tested out of compliance

9    (i.e., that impermissibly high levels of any contaminant were present in the water at its various points

10   of use).

11           In addition to the raw water testing data discussed above, Defendants also offer the

12   declarations of their experts.  Specifically, Defendants offer the declarations of the following: Dr. Dean

13   O. Cliver, a professor in the Department of Population Health and Reproduction at the University of

14   California at Davis (Defendants' Exhibit D); Joseph C. Scalmanini, a registered civil engineer and

15   founding partner of Luhdorff & Scalmanini, Consulting Engineers (Defendants' Exhibit H); and Dr.

16   Marylynn Villinski Yates, a professor in the Department of Environmental Science department at the

17   University of California at Riverside (Defendants' Exhibit J).[12]

18           In his declaration, Dr. Cliver states that, based on his review of documents relating to the

19   condition of the water supply at CCI, "...percolation of treated wastewater through a vadose zone at least

20   16 feet deep would have eliminated microbial hazards such as bacteria, viruses, and parasites" and

21   opines that "[s]uch percolation would further reduce the levels of volatile organic compounds ...."  Dr.

22   Cliver also opines that nitrates typically only pose an adverse health risk to infants six months old or

23   less.  Dr. Cliver further opines that "...the water at CCI met all applicable standards..." and that "...no

24   maximum contaminant level [MCL] was ever met or exceeded at any time reflected in the documents."

25   Dr. Cliver concludes that the water at CCI is of a higher quality than that available in much of the United

---

[11]    Testing was conducted under a schedule imposed by DHS incident to the March 8, 1994, compliance order.

[12]    The court considers the declarations of those experts who offer opinions and/or conclusions with respect to the relevant issue identified in this opinion.

States and states that he would have no concern about drinking the water himself.

Mr. Scalmanini states in his declaration that he was retained by Defendants' counsel to investigate Plaintiffs' claims and that he prepared a report of the results of his investigation.[13] Mr. Scalmanini concludes that, based on his investigation, "...there is no evidence of any failure of the CCI-Tehachepi ground-water system to comply with any primary (health related) or secondary (aesthetic) drinking water quality standards...including bacteriological, general mineral, general physical, inorganic, organic, and radioactive constituents." Mr. Scalmanini states that regular sampling and analysis of the water (including weekly sampling from the distribution system), indicated that the water met all applicable standards and was bacteriologically disinfected at all times.

Dr. Yates states in her declaration that she was retained by Defendants' counsel to assess the potential for pathogen contamination of the drinking water supply at CCI and that she prepared a report of her findings.[14] Dr. Yates concludes that "...the available data do not support the contention that pathogenic microorganisms were present in the drinking water served to individuals at CCI-Tehachepi...in high enough concentrations to cause numerous individuals to become ill."

Based on this evidence, Defendants argue that, since the water provided to Plaintiffs never tested out of compliance, it necessarily met society's standards of decency as those standards are defined by the applicable regulations and, therefore, that Plaintiffs were not exposed to an excessive risk to their safety. Defendants conclude that, based on the evidence presented, there exists no genuine issue of fact as to the essential objective element of Plaintiffs' claims. Defendants have presented ample evidence that the drinking water supplied to Plaintiffs during the relevant time period never tested out of compliance. The court finds that Defendants have thus met their initial burden of informing the court of the basis for their motion and presenting evidence which they believe demonstrates the absence of a genuine issue of material fact.

/ / /

/ / /

---

[13]   Mr. Scalmanini's report is attached to his declaration as Attachment 2.

[14]   Dr. Yates' report is attached to her declaration as Attachment 2.

13

1        3.    Plaintiffs' Evidence

2                Defendants having met their initial burden, the burden shifts to Plaintiffs to establish that

3    a genuine issue of fact actually exists with respect to the objective element of their claims. Specifically,

4    Plaintiffs may establish that there exists a triable issue of fact by presenting evidence that the water

5    supplied to the units tested out of compliance with applicable regulations and, thus, posed an excessive

6    risk to inmate safety.  Or, alternatively, Plaintiffs may present evidence that, as measured by some

7    indicator of society's contemporary standards of decency other than applicable regulations, or for some

8    other reason, the water posed an excessive risk.  The court will next turn to a detailed discussion of

9    Plaintiffs' evidence in order to determine if they have met their burden of showing the existence of a

10   genuine issue of fact as to the risk posed by the water.

11               The court first examines the transcript of the deposition of Plaintiffs' expert witness –

12   Dr. Lessenger, who is a medical doctor specializing in toxicology -- taken on December 28, 1998.  Dr.

13   Lessenger stated that he "has a problem" with the existence of VOCs, in any amount, in the water at

14   CCI, even if that amount is within the applicable MCL.  Dr. Lessenger stated that the primary danger

15   from VOCs was from exposure while showering. Dr. Lessenger explained in his deposition that, when

16   a person showers in water containing even levels of VOCs below the applicable MCL, the heated water

17   further volatizes the VOCs and the person is exposed to such further volatized compounds in gaseous

18   form.  Dr. Lessenger opined that, in this form, the VOCs are inhaled and enter the bloodstream directly

19   and present a bigger risk than drinking water which contained levels of VOCs below the MCL.[15]

20   / / /

21

22   _____

23        [15]    Dr. Lessenger's deposition testimony on this issue as follows:

24               That's what happens is you shower and you volatize the VOCs.  They suddenly
                 come in gaseous form that is inhaled and it goes right into the bloodstream, okay?
25               And that's why a lot of these people came out of the show dizzy.  Where if you
                 drink it, you have water, you have food stubs.  There's a – there has been more
26               absorption mechanisms and they've got to absorb these chemicals into the
                 bloodstream, where if you shower, it's volatized.  You inhale it.  It goes right into
27               the bloodstream.  So it's not the drinking water that bothers me so much.  As I
                 looked at these cases and reviewed the data, it was the showering.  These five people
28               that I talked to invariable said that they were sick.  They were most dizzy after they
                 came out of the shower and that all fit.

14

In exploring this opinion during the course of Dr. Lessenger's deposition, the following exchange of questions and answers occurred:

> Q:     And so at what levels would these VOCs have to be to be as harmful through the shower as you claim?
>
> A:     I don't have the research data, scientific data to be able to give you a number.
>
> Q:     How do you know that the levels that are reported for these VOCs at CCI were at these levels where they became harmful when inhaled during the [shower]?
>
> A:     The only – consistently, first of all, two things.  First of all is the knowledge through reading research reports of the shower effect of aerosolization and vaporization of the VOCs in the water, okay?  That, and two, the clear-cut history that these people give of coming out of the shower dizzy and sick.

While Dr. Lessenger could not point to any specific research data to support his conclusion regarding the risk posed by exposure to volatized VOCs in gaseous form, he bases his opinion on (1) his knowledge of the "aerosolization and vaporization" effect based on the research literature and (2) his findings upon examining five of the individual plaintiffs.[16]

The court finds that these factual bases for Dr. Lessenger's opinion are reasonable and that the inference can be drawn that the presence of VOCs in the water supplied to Plaintiffs – even in amounts below the applicable MCL – posed an excessive risk.  The court next turns to an analysis of Plaintiffs' remaining documentary evidence in light of this inference.[17]

Plaintiffs' Exhibit A is the verified first amended complaint filed on December 22, 1994.  In this document, Plaintiffs allege that DHS had determined that Wells 10, 11, and 12 were contaminated with raw sewage.[18]  Plaintiffs further allege that Richard Haberman, an engineer with DHS, determined that it was ill-advised to put a water well source downstream from a raw sewage treatment area.  Finally,

---

[16]     Dr. Lessenger stated that he conducted medical examinations of five individual plaintiffs -- Dwayne McElwee, Earl Wilson, Cornell Wayne Walters, Ricardo Leyva, and June Elliott. He stated that a common complaint of the five inmates he examined was, among other health problems, dizziness after showering.

[17]     Given the fact that, as indicated above, VOCs are not affected by chlorinization, evidence of the existence of VOCs at any point in the groundwater system is particularly relevant to Dr. Lessenger's theory of risk.

[18]     The 1994 compliance order is attached as an exhibit to the amended complaint in support of this allegation.

15

1  Plaintiffs conclude that sewage from the treatment process contaminated the wells and that they were

2  injured when they consumed water from the wells. Specifically, Plaintiffs allege that "[a]s a proximate

3  result of their regular consumption of this contaminated water, plaintiffs have become ill..."

4      Other than the conclusory allegation that Plaintiffs consumed contaminated water, the

5  verified amended complaint, when construed as the signing Plaintiffs' declarations, does not constitute

6  specific evidence that the water tested out of compliance at any point of use. Nor does the verified

7  amended complaint constitute evidence that, as measured by any indicator of social standards, the water

8  posed an excessive risk. The allegation that Wells 10, 11, and 12 were too close to the wastewater

9  treatment facility is not evidence that the water posed an excessive risk at any point of use. Therefore,

10 the court finds that the verified first amended complaint does not, in and of itself, constitute evidence

11 sufficient to create a genuine question of triable fact on the issue of risk.

12      Plaintiffs' Exhibit B is the court's order issued on July 18, 1997, denying Defendants'

13 first motion for summary judgment in this case. Pursuant to Fed. R. Evid. 201, the court takes judicial

14 notice of its previous order as evidence properly before the court. See also United States v. Wilson, 631

15 F.2d 118, 119 (9th Cir. 1980). Upon review of the order, the court notes that one of the disputed facts

16 was whether tests performed on water from Wells 10, 11, and 12 ever showed any contaminants in

17 excess of any MCLs allowed by law or regulation. As to this issue, the court considered the declaration

18 of Dr. Cliver, who concluded that the water at CCI met all applicable standards and that no maximum

19 contaminant level was ever met or exceeded. The court also considered Defendants' Exhibit F-1

20 (attached to their first motion for summary judgment) which consisted of test results of water sampled

21 directly from the wells. Those test results showed that some of the well samples indicated positive for

22 coliform during 1995 and 1996. The court noted in its order, however, that "...these records did not

23 indicate positive test results in excess of any legal limits after chlorinization..." (emphasis in original

24 order). The court never concluded in its previous order that the water posed an excessive risk at the

25 point of use.[19]

26

27  [19]  While Defendants conceded that Plaintiffs had been exposed to a substantial risk of harm, such concession
    was made for purposes of the first motion for summary judgment only. Defendants' first motion was based on evidence
28  which they believed demonstrated the lack of any genuine triable issue as to the subjective element of Plaintiffs' claims.

1    Plaintiffs' Exhibit C is the declaration of Dr. Lessenger.  Dr. Lessenger states that he

2  found thirteen different contaminants to be present in the water supplied to Unites I, II, and III.

3  Specifically, Dr. Lessenger states that the records he reviewed showed the presence of PCE (a VOC),

4  toluene, chloroform, ethylbenzene, 1.4-dichlorobenzene, sulfates, nitrates, iron, copper, manganese,

5  magnesium, zinc, and xylene.  Dr. Lessenger also notes that the inmates have generally described the

6  water as looking, smelling, and tasting terrible.  However, Dr. Lessenger does not specify which records

7  he reviewed and, in any event, he does not specify whether the testing data he reviewed was for samples

8  taken from the wells or points of use in the units.  Further, Dr. Lessenger does not state that any

9  contaminants were detected in levels exceeding the applicable MCLs.  However, when viewed in the

10  light most favorable to Plaintiffs, the declaration allows for the reasonable inference that the

11  contaminants identified by Dr. Lessenger -- which include VOCs -- may have been present in the

12  groundwater system.

13    Plaintiffs' Exhibit D consists of Plaintiffs' responses to Defendants' second set of

14  interrogatories.  Specifically, Plaintiffs state that they claim that water drawn from Wells 10, 11, and 12

15  was contaminated at the point of use.  Other than this conclusory statement, the document does not

16  constitute any evidence to support the assertion.  While Plaintiffs refer to various testing data indicating

17  that the water tested out of compliance in violation of applicable regulations, Plaintiffs' answers indicate

18  that such data was compiled based on tests of water taken from the wells and not from any point of use.

19  Therefore, this document does not present any specific evidence to support the conclusory statement that

20  the water provided at the point of use tested out of compliance.  Therefore, the court finds that Plaintiffs'

21  answers to Defendants' second set of interrogatories do not constitute evidence sufficient to create a

22  genuine question of triable fact on the issue of risk.

23    Plaintiffs' Exhibit E is a May 11, 1993, memorandum from Wendell Francisco, Associate

24  Hazardous Materials Specialist at CCI, regarding a PCE spill at the Unit II dry cleaning plant.  Mr.

25  Francisco states that, while investigating the spill scene, he noticed that the dry cleaning machines were

26  leaking at a point where PCEs entered the machines.  Mr. Wendell states that a decision was made to

27  discontinue operation of the dry cleaning plant until the leaks had been corrected.  Plaintiffs offer this

28  document to explain why some water samples tested positive for PCE.  However, this document is not

evidence that PCEs were found in excess of the MCL in any water sample taken from a point of use. The document does, however, constitute evidence of the source of PCE contamination that was detected in the groundwater system.

Plaintiffs' Exhibit F is a CDC capital outlay budget change proposes for 1996-1997. The document states that "[t]he presence of contaminants in the wells, which are associated with the waste disposal operation, demonstrates that the wells are not located at an adequate distance from the source of the contamination and pollution." As discussed above, the question of whether the wells are located too close to the wastewater treatment facility is not relevant. Therefore, the court finds that this document does not constitute evidence sufficient to create a genuine question of triable fact on the issue of risk.

Plaintiffs' Exhibit G is a May 10, 1996, letter from Lonnie Wass, a Senior Engineer at the California Regional Water Quality Control Board, Central Valley Region, indicating that sewage discharge at CCI had been found to violate state regulations. However, as with the previous document, this document concerns the connection between the proximity of the wells to the wastewater treatment facility and contamination found in water samples taken from the source. The document does not indicate that the water provided for use to the units was unsafe. Therefore, the court finds that this document likewise does not constitute evidence sufficient to create a genuine question of triable fact on the issue of risk.

Plaintiffs' Exhibit H is an August 11, 1994, letter from Mr. Haberman, an engineer at DHS, regarding the March 1994 compliance order. Plaintiffs offer this document as evidence that CDC was pursuing a capital expenditure for a new source of drinking water at CCI. While this is evidence that CDC officials were concerned with potential problems with respect to the existing source of drinking water, it is not evidence that the water as it was provided for use was unsafe.

Plaintiffs' Exhibit I consists of DHS's report following an annual inspection of CCI's groundwater systems conducted on March 4, 1997, and May 27, 1997. Specifically, the report evaluates compliance with previous DHS enforcement actions related to contamination of the wells due to their proximity to the spray irrigation field. Upon careful review of the report, however, the court notes that it does not address the quality of the water at any point of use. Section I of the report discusses the

18

1   quality of the water at various points along the distribution system, but does not include a discussion of

2   the quality of the water that eventually reached the units.[20]

3   　　　　　Plaintiffs' Exhibit J is a July 28, 1998, letter from Robert Jasper, General Manager of the

4   Tehachepi-Cummings County Water District, regarding CCI's discontinuation of use of Well 10.  The

5   letter indicates that the well was not destroyed because of the need to use that well site for periodic

6   monitoring of the groundwater basin.  It appears that Plaintiffs offer this document as evidence that CCI

7   decided to discontinue using water from Well 10.  The document, however, does not indicate the reason

8   use of Well 10 was discontinued and, further, is not relevant to the issue of the quality of the water at

9   the point of use.  Therefore, the court finds that this document does not constitute evidence sufficient

10   to create a genuine question of triable fact on the issue of risk.

11   　　　　　Plaintiffs' Exhibit K is An August 14, 1996, memorandum from Cora Monson, Assistant

12   Deputy Director of CDC's Office of Environmental, Health, and Safety Management, regarding various

13   capital outlay budget proposals for a new potable water source and renovation of the wastewater

14   treatment system.  As with Exhibit J, the document does not relate to the issue of the quality of the water

15   at the point of use and, as such, does not create a genuine question of triable fact on the issue of risk.

16   　　　　　Plaintiffs' Exhibit L is an April 30, 1996, letter from Mr. Haberman regarding various

17   recommendations to "...assure that the safest water quality possible is delivered to the water

18   users...(employees and inmates)."  The recommendations are: (1) maximize use of surface water and

19   minimize use of groundwater from the wells; (2) re-route groundwater drawn from the wells through

20   the surface water treatment system for additional treatment; (3) maximize setback distance from wells

21   in operation of the spray irrigation field; (4) conduct an accurate and ongoing groundwater monitoring;

22   (5) review the existing groundwater chlorinization and disinfectant systems; (6) monitor well head

23   housings; and (7) conduct further tests of water samples taken from the wells.  The document does not

24   controvert Defendants' evidence regarding the quality of the water at the point of use.  However, the

25   inference can be drawn from this document that DHS was concerned that the groundwater system might

26   not have been supplying safe drinking water.  This inference leads to the further inference that the

27   _____

28   　　　[20]　　It is interesting to note that, according to the report, regular testing data of water sampled from the distribution system showed that there were "...no violations of the total coliform standard since at least 1990."

1   groundwater supply was in fact not safe.

2             Plaintiffs' Exhibit M is a June 17, 1996, memorandum from James Tilton, Deputy

3   Directory of CDC's Administrative Services Division, and G. Kevin Carruth, Deputy Director of CDC's

4   Planning and Construction Division.  The document is identical in content to Exhibit K and, for the

5   reasons discussed above with respect to such exhibit, does not controvert Defendants' evidence

6   regarding the quality of the water at the point of use and, as such, does not create a genuine question of

7   triable fact on the issue of risk.

8             Plaintiffs' Exhibit N is an October 30, 1995, letter from T.E. Vaughn, Associate Warden

9   at CCI, which addresses DHS's water concerns.  The letter indicates that laboratory analysis of water

10   samples from Wells 11 and 12 indicated positive for coliform and fecal matter and also indicates that

11   DHS has recommended that use of Well 10 as the primary groundwater source with Well 12 providing

12   secondary supply and Well 11 for emergency use only.  Mr. Vaughn states that, given this use scenario,

13   Well 10 will have a very short lifespan.  Mr. Vaughn summarizes the situation by stating that "...CCI

14   does not have the necessary resources to continue supplying the institution with a safe and healthy water

15   supply" and adds that "...CCI has run out of time."  Mr. Vaughn concluded by stating that the matter

16   "...is becoming a serious health and safety issue and CCI feels this is an emergency situation."

17             The court pays particular attention to this letter given the role it played in the court's

18   analysis of Defendants' first motion for summary judgment.  While Mr. Vaughn's statements are

19   alarming, they are not evidence of the quality of the water at the point of use.  The letter does not

20   indicate that water samples taken from any point of use ever tested out of compliance or was found to

21   be unsafe.[21]  However, the inference may be drawn that, given prison officials' concerns, there may well

22   have been safety issues with respect to the water supplied to inmates.

23             Plaintiffs' Exhibit O is a January 2, 1996, memorandum from Dennis Wehsels, an analyst

24   with CDC's Planning and Construction Division.  In this memorandum, Mr. Wehsels states that the

25   "...wastewater effluent spray fields may have an impact on the domestic water wells and if we can reduce

26   or eliminate coliform and E. Coli in the effluent spray, it may alleviate the problem with the domestic

27

28      [21]     This document is related, however, to the subjective component of Plaintiffs claims.

1  water supply." As with many of Plaintiffs' other exhibits, this document relates to concerns regarding

2  the proximity of the wells to the spray irrigation field. The document does not controvert Defendants'

3  evidence regarding the quality of the water. Further, the document does not constitute evidence of the

4  presence of VOCs in the groundwater system.

5          Plaintiffs' Exhibit P is a CDC capital outlay project concept paper for fiscal year 1996-

6  1997. The document outlines various cost-benefit considerations with respect to the DHS compliance

7  order. As with Plaintiffs' other documents, this document discusses concerns with respect to the

8  location of the wells in proximity to the wastewater treatment facility. The document does not

9  controvert Defendants' evidence regarding the quality of the water at the point of use or constitute

10  evidence of the presence of VOCs in the groundwater system.

11          Plaintiffs' Exhibit Q is an October 27, 1993, letter from the foreperson of the 1993-1994

12  Grand Jury to all CCI water quality complainants. This letter indicates that all water samples (including

13  a sample taken from a cell) have tested within safety limits and that no action will be taken by the Grand

14  Jury. The document does not controvert Defendants' evidence regarding the quality of the water or

15  constitute evidence of the presence of VOCs in the groundwater system.

16          Plaintiffs' Exhibit R is a July 1994 report prepared by Weston & Associates for CDC

17  regarding the March 1994 compliance order. Plaintiffs indicate that the document sets forth water

18  testing data for samples taken from Wells 10, 11, and 12  The report indicates that "...[a]ll three water

19  supply wells are apparently impacted by the waste water treatment system spray field." As discussed

20  above, the condition of the water at the wells is not relevant. The document does not controvert

21  Defendants' evidence regarding the quality of the water at the point of use or constitute evidence of the

22  presence of VOCs in the groundwater system.

23          Plaintiffs' Exhibit S is a 1993 DHS report on the water systems at CCI. The report

24  concludes that "...the groundwater source and associated chlorinization treatment are not an acceptable

25  source of supply and should not be used." The testing data for VOCs cited in the report indicate that the

26  water tested below the MCLs for such contaminants. Further, the report states at page 10 that

27  "...CCI...has not failed the bacteriological water quality standards since January 1990." Based on the

28  foregoing, the court finds that the document does not controvert Defendants' evidence regarding the

1  quality of the water at the point of use.  Given the indication that VOCs were (albeit in levels below the

2  MCL), the document constitutes evidence of the existence of such compounds in the groundwater

3  system.

4  Plaintiffs' Exhibit T consists of analytical testing reports prepared by Calscience

5  Environmental Laboratories of water samples taken throughout May and June 1994 from Wells 10, 11,

6  and 12.  Some of the tests indicate concentrations of TCE, PCE, chlorobenzene, and toluene above

7  reportable limits.  As with Exhibit S, the document constitutes evidence of the existence of VOCs in the

8  groundwater system.

9  Plaintiffs' Exhibit U is an October 6, 1995, letter from Alice Cook and Cortez Swanigan,

10  CCI water treatment personnel, which states that there was "...a significant trend of positive coliform

11  bacteria results from two separate laboratories' analysis of our...weekly bacteriological sampling of the

12  wells prior to chlorinating."  However, as indicated from this text (which was cited by Plaintiffs in their

13  opposition papers), indicates that the water samples tested were taken from the wells even before the

14  chlorinization process.  The document does not contradict Defendants' evidence concerning the quality

15  of the water at the point of use or constitute evidence of the presence of VOCs in the groundwater

16  system.

17  Plaintiffs' Exhibit V consists of analytical testing reports prepared by Zalco Laboratories

18  of water samples taken from Wells 10, 11, and 12 between August 1995 and January 1996.  Plaintiffs

19  state that the documents indicate that several of the well water samples tested positive for coliform and

20  fecal contaminants.  One document indicates that, "[b]ased on the bacteriological analysis, the submitted

21  water sample is not within Title 23 specifications for same drinking water."   The document does not

22  controvert Defendants' evidence regarding the quality of the water at the point of use or constitute

23  evidence of the presence of VOCs in the groundwater system.

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

1  Plaintiffs' Exhibit W is a March 21, 1994, memorandum from Cora Monson regarding

2  the March 1994 DHS compliance order.  Specifically, Ms. Monson notes that the compliance order

3  found CCI to be in violation of various provisions of the California Code of Regulations.[22]  Plaintiffs

4  quote this memorandum in their opposition papers as follows:

> Although the well water has not exceeded any maximum contaminant
> level under the California Safe Drinking Water Act, Mr. Haberman
> indicated that the wells are not an adequate horizontal distance from
> the spray disposal fields to ensure protection against contamination
> and pollution and, as a consequence, the monitoring results of water
> from the wells demonstrate that the waste water treated and disposed
> of at CCI is infiltrating the ground water aquifer used for domestic
> supply.

10  Again, this document relates to the issue of the proximity of the wells to the wastewater treatment

11  facility and not to the quality of the water at the point of use.  In fact, the document indicates that the

12  well water has not exceeded any MCL.  Therefore, the document does not controvert Defendants'

13  evidence regarding the quality of the water at the point of use or constitute evidence of the presence of

14  VOCs in the groundwater system.

15  Plaintiffs' Exhibit X is a March 15, 1995, memorandum from Steven Woycheshin,

16  Associate Hazardous Material Specialist with CDC's Office of Environmental, Health, and Safety.  The

17  documents sets forth a chronology of events May 10, 1994, to March 14, 1995, relating to the water

18  issues at CCI from.  The memorandum indicates as follows: (1) on June 17, 1994, laboratory results

19  indicated that CCI's groundwater supply tested within the applicable MCLs for all constituents; (2) on

20  August 1, 1994, CDC's proposal with respect to the DHS compliance order was apparently accepted by

21  Mr. Haberman on behalf of DHS; (3) on August 16, 1994, laboratory results of wastewater effluent

22  samples collected by CCI personnel indicated that chloroform had been detected; and (4) on December

23  22, 1994, a fax was received from Mr. Haberman which indicated that CCI's water meets state

24  standards.  Of particular note is an entry which states that "...[o]n March 14, 1995 Stephen Perkins

25  [former counsel for Defendants] left a message that inmates attorney was abandoning the attempt to get

26  an emergency order on CCI's water since their own Doctor and lab results indicated that there was no

---

[22]  As noted above, such violations related to the proximity of the wells to the spray irrigation field.

23

1   condition that required remedy." [sic]. Finally, Mr. Woycheshin opined that the DHS compliance order

2   "...appears to be based more on possible future water quality degradation than on existing water quality."

3           Upon careful review of this document, the court finds nothing to controvert Defendants'

4   evidence indicating that the water provided to Plaintiffs at the point of use was safe.  In fact, even the

5   references contained in this document to the quality of the water at the source (which, as discussed at

6   length above, is not relevant to this case) indicate that the water did not test out of compliance and there

7   is no indication regarding VOCs.  The only reference to contaminants was with respect to wastewater.

8   Therefore, the document does not create a genuine question of triable fact on the issue of risk.

9           Plaintiffs' Exhibit Y is an August 21, 1995, letter from Mr. Haberman summarizing

10  testing data for water samples taken from Well 11 between January 18, 1995, and July 19, 1995.  Mr.

11  Haberman states that the results "...indicate the presence of total coliform and E. Coli bacteria in water

12  produced from Well 11."  Mr. Haberman further states that, based on the results, CCI should "...not use

13  this well unless absolutely necessary and ensure that adequate, continuous disinfection is provided

14  whenever the well is in use."  As with Plaintiffs' other exhibits, this document relates to the quality of

15  the water at the source.  Further, the court notes that Mr. Haberman's warning regarding the use of Well

16  11 does not constitute an order that the well not be used.  Rather, it indicates that there is a concern and

17  that the well should be used cautiously.  Mr. Haberman's statement indicates that, if the well is used and

18  adequate disinfectant processes are utilized, these concerns are alleviated.  Finally, there is no indication

19  regarding VOCs.  The court finds that  document does not controvert Defendants' evidence regarding

20  the quality of the water at the point of use or constitute evidence of the presence of VOCs in the

21  groundwater system.

22          Plaintiffs' Exhibit Z consists of analytical testing reports prepared by Zalco Laboratories

23  of water samples taken from Wells 10, 11, and 12.  As with Exhibits T and V, none of the testing results

24  are for water samples taken from any point of use.  Therefore, the document does not controvert

25  Defendants' evidence regarding the quality of the water at the point of use or constitute evidence of the

26  presence of VOCs in the groundwater system.

27  / / /

28  / / /

24

1       Plaintiffs' Exhibit AA is an undated and unsigned draft memorandum from James Tilton,

2   Deputy Directory of CDC's Administrative Services Division, and G. Kevin Carruth, Deputy Director

3   of CDC's Planning and Construction Division. The document is identical in content to Exhibits K and

4   M and, for the reasons discussed above with respect to such exhibits, does not controvert Defendants'

5   evidence regarding the quality of the water at the point of use and, as such, does not create a genuine

6   question of triable fact on the issue of risk.

7       Plaintiffs' Exhibit BB is a site layout map of CCI. It shows that Wells 10, 11, and 12 are

8   all in close proximity to the wastewater treatment facility and spray irrigation field. However, given that

9   the locations of the wells is not disputed, the court finds that the document does not create a genuine

10  question of triable fact on the issue of risk.

11      Plaintiffs' Exhibit CC is an October 31, 1991, letter from Mr. Haberman. The court

12  cannot discern any relevance of this document with respect to the quality of the water at any location and

13  Plaintiffs do not indicate in their opposition papers what import they attach to the document. Therefore,

14  the document does not create a genuine question of triable fact on the issue of risk.

15      Plaintiffs' Exhibit DD is an August 11, 1994, memorandum from James Stites, an

16  engineer with DHS. In the memorandum, Mr. Sites comments as follows:

> The reports concludes that, based on the results of DOC [Department of Corrections] sampling, the PCE concentration in the ground water varies from below the reportable detection limit to slightly over the reportable detection limit. However, based on the following factors the PCE concentrations in water produced from the wells are not necessarily an accurate indication of the PCE concentration in the ground water. PCE is a volatile compound that can be volatized when pumped through a domestic supply well. As such, PCE detected in a water sample obtained from a domestic supply well may not accurately represent the true PCE concentration in the source aquifer.

23  Plaintiffs seem offer this document as evidence that, even if the PCE concentrations detected in water

24  samples taken from the wells was below the MCL, that concentration may actually be higher given the

25  volatile nature of the compound. However, the document states just the opposite: given the volatile

26  nature of PCE, pumping the water through a well to the location where it is ultimately sampled may

27  result in elevated PCE readings over the actual levels in the aquifer. In any event, the document, when

28  read in the light most favorable to Plaintiffs, constitutes evidence that the water may have had

concentrations of PCE over the MCL at the source.

Plaintiffs' Exhibit EE is a March 29, 1994, letter from Ms. Monson. Plaintiffs quote the following passage in the letter: "Mr. Haberman felt that CCI has allowed the disposal of waste water to degrade the quality of ground water it uses for domestic supply and this degradation precludes the ground water supply from being a reliable supply of healthful water." Thus, according to Mr. Haberman, the degradation in the quality of the groundwater caused by the proximity of the wells to the wastewater treatment facility has resulted in that water not being healthy to drink. By presenting this quote from Ms. Monson's letter, Plaintiffs appear to be offering Mr. Haberman's alleged out-of-court statement into evidence for the truth of the matter stated (i.e., that the water was not healthy to drink). Offered in this manner, the letter constituted inadmissible hearsay.

Further, overlooking the hearsay issue, if Mr. Haberman's statement were true, it would only mean that the water as it came out of the wells was not healthy to drink. Nothing in the statement (or elsewhere in Exhibit EE) speaks to the chlorinization process the water underwent after it was pumped from the wells or indicates that the water provided to the units was unsafe. Further, the document is silent as to VOCs. Therefore, the document does not create a genuine question of triable fact on the issue of risk as that issue has been identified in this opinion.

Plaintiffs' Exhibit FF is an April 27, 1994, memorandum from Mr. Woycheshin regarding the possibility of drilling new wells in order to satisfy the DHS compliance order. The document does not controvert Defendants' evidence regarding the quality of the water at the point of use or constitute evidence of the presence of VOCs in the groundwater system.

Plaintiffs' Exhibit GG is a November 10, 1994, memorandum from Harvey Colling, an engineer with DHS's Division of Drinking Water and Environmental Management. The document does not controvert Defendants' evidence regarding the quality of the water at the point of use or constitute evidence of the presence of VOCs in the groundwater system.

Plaintiffs' Exhibit HH is a November 27, 1995, memorandum from Mr. Carruth regarding funding for improvements to "...provide potable water for three institutions..." The document does not specifically refer to CCI or the issues raised in this litigation. However, even assuming the document relates to funding related to the water issues at CCI, the document does not controvert Defendants'

26

1  evidence regarding the quality of the water at the point of use or constitute evidence of the presence of

2  VOCs in the groundwater system.

3        Plaintiffs' Exhibit II is a December 13, 1993, memorandum from C.J. Howard, Chief of

4  Plant Operations at CCI, in which he criticizes DHS's position with respect to the groundwater at CCI

5  (specifically, the opinions of Mr. Haberman and Mr. Stites expressed in a DHS report).  Mr. Howard

6  concludes that "...the action taken by the Department of Health Services is unwarranted and

7  irresponsible."  The court is unclear as to the purpose for which this document is offered by Plaintiffs.

8  At best, this document represents the opinions of the author.  The document does not controvert

9  Defendants' evidence regarding the quality of the water at the point of use or constitute evidence of the

10  presence of VOCs in the groundwater system.

11        Plaintiffs' Exhibit JJ consists of excerpts of a December 15, 1993, assessment and site

12  inspection conducted by Bechtel which, according to Plaintiffs, indicate that samples collected from the

13  wastewater treatment ponds in June 1993 tested positive for various toxins.  Plaintiffs state that these

14  same contaminants were founds in water samples taken from the wells.  Plaintiffs conclude that toxins

15  found in the wastewater are going directly into the groundwater.  Even if this is true, the document, at

16  best, would represent evidence that the groundwater was contaminated at the source.  The document is

17  silent as to VOCs.  The document does not controvert Defendants' evidence regarding the quality of the

18  water at the point of use or constitute evidence of the presence of VOCs in the groundwater system.

19        Plaintiffs' Exhibit KK is a "contact log" which was attached to the original Bechtel

20  report.  This document has no bearing on the relevant issue in this case and, as such, does not create a

21  genuine question of triable fact.

22        Plaintiffs' Exhibit LL consists of analytical testing reports prepared by Calscience

23  Environmental Laboratories of water samples taken from Wells 10 and 12.  The documents indicate

24  positive readings of PCE.  Therefore, the documents are evidence of the existence of VOCs in the

25  groundwater system.

26  ///

27  ///

28  ///

1       Plaintiffs' Exhibit MM consists of excerpts from an April 1998 report entitled "Waste

2 Water Treatment Plant and New Potable Water Source Study" prepared by Boyle Engineering

3 Corporation. Plaintiffs quote the following from the report:

4               Chloroforms have also been found in the ground water. Chloroforms
              are indicator organisms that indicate the potential presence of harmful

5               bacteria. There is some reason to believe that the locations of the
              wells near the treated waste water spray fields may have allowed these

6               organisms to enter the ground water..

7 While this document is evidence that certain contaminants may have been present in the water at its

8 source (i.e., the wells), the document does not controvert Defendants' evidence regarding the quality of

9 the water at the point of use or constitute evidence of the presence of VOCs in the groundwater system.

10       As to Plaintiffs' Exhibits NN and OO, these documents have been offered without any

11 supporting declaration to lay a proper foundation or to advise the court as to the significance of such

12 documents. As such, the documents are not properly before the court as evidence in opposition to the

13 instant motion.

14       In light of Plaintiffs' documentary evidence, the court finds that there is ample evidence

15 such that a reasonable jury could find that VOCs were present in CCI's groundwater supply and that

16 those compounds reached the point of use. If Dr. Lessenger is correct, the water supplied at the point

17 of use (which necessarily includes showerheads) may have represented a risk to Plaintiffs even if the

18 amounts of VOCs detected at the various points of use were below the applicable MCL. If Dr.

19 Lessenger is not correct, Defendants' evidence that the water provided to Plaintiffs at the point of use

20 was not dangerous stands uncontroverted. In order to grant summary judgment in this case, the court

21 would have to make this determination. However, whether or not to believe Dr. Lessenger, or what

22 weight his opinion is to be given, is a question of fact for a jury that the court cannot decide as a matter

23 of law. To do so would be reversible error.

24       Therefore, based on an exhaustive analysis of all of the evidence presented on the issue

25 of risk, the court finds that a genuine question exists as to a material fact.

26 / / /

27 / / /

28 / / /

**B.      Qualified Immunity**

Defendants argue that summary judgment is appropriate because they are entitled to qualified immunity on Plaintiffs' claims.  The court notes that Defendants' qualified immunity argument was rejected in its previous order issued on July 18, 1997, denying Defendants' first motion for summary judgment.  Upon review of Defendants' previous motion and the court's order thereon, as well as all the evidence presented in support of the instant motion, the court finds no basis for reversing its previous order.  Therefore, for the reasons set forth in the court's July 18, 1997, order, Defendants' qualified immunity argument is rejected.

Accordingly, the court HEREBY ORDERS that Defendants' motion for summary judgment is DENIED.

DATED: *May 4, 1999*

SANDRA M. SNYDER
UNITED STATES MAGISTRATE JUDGE

United States District Court
for the
Eastern District of California
May 4, 1999


* * CERTIFICATE OF SERVICE * *


1:94-cv-05712


McElwee

       v.

Gomez

_____

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  May 4, 1999, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office.


        Bernice Louie Yew                    SMS P
        Attorney General's Office of the State of California
        PO Box 944255
        1300 I Street
        Suite 125
        Sacramento, CA  94244-2550

        Herman A D Franck V
        Franck and Franck
        Showcase Design Center
        2 Henry Adams Street
        Mezzanine M 41
        San Francisco, CA  94103

        Stephen Thomas Gargaro
        Franck and Franck
        Showcase Design Center
        2 Henry Adams Street
        Mezzanine M 41
        San Francisco, CA  94103